United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 14, 2004**

Charles R. Fulbruge III
Clerk

REVISED APRIL 15, 2004
**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

NO. 03-50427

_____

**MANUELA BELTRAN,**
**Individually and as legal representative**
**on behalf of the heirs of both the**
**Estate of Irene Beltran Garcia,**
**and the Estate of Sonye Leigh Herrera,**

**Plaintiff-Appellee,**

**versus**

**THE CITY OF EL PASO, et. al.,**

**Defendants,**

**SYLVIA AMADOR,**
**also known as D590SA,**
**also known as Operator Lewis,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Western District of Texas**
**EP-02-CV-206-PRM**
_____

Before HIGGINBOTHAM, JONES and MAGILL,* Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case arises from a father's murder of his wife and

fifteen-year old daughter. The girl's grandmother filed this

damage action against the City of El Paso and the 911 operator who

---

* Circuit Judge of the United States Court of Appeals for the Eighth
Circuit, sitting by designation.

allegedly mishandled the victim's initial emergency call. The district court perfunctorily denied the 911 operator's motion for summary judgment on qualified immunity grounds, and the 911 operator now appeals. Because the appellee failed to state a violation of clearly established equal protection or due process rights against the 911 operator, we reverse and remand for entry of judgment in her favor.

## I. BACKGROUND

In November 1999, Sonye Herrera ("Sonye") called 911 to report that her father, Armando Herrera ("Herrera"), was drunk and was becoming physically and verbally abusive to her and her mother, Irene Beltran-Garcia ("Garcia"). Police units were dispatched and Sonye's father was arrested and charged with felony child injury.

A few months later, on April 16, 2000, Sonye again called 911 from her home to report that her father was drunk and potentially violent. Sylvia Amador, the 911 operator who received the call, discussed the situation with Sonye in order to ascertain the nature of the emergency. At the outset of the call, Sonye indicated that her father had threatened her and that she was afraid for her life and hiding in a bathroom, but she did not indicate that she had been physically abused. Sonye repeatedly asked Amador to send the police to her house. Amador responded to Sonye that the police were receiving the information that Amador was placing into the 911 system. At one point during the call,

2

Sonye informed Amador that she believed her father had left the premises. Amador then requested information about Herrera's automobile and potential destination. Before disconnecting the call, Amador informed Sonye that the police would be sent out and suggested that if Sonye believed her father was still in the house, she might wish to remain locked in the bathroom for her safety. Amador then disconnected the call.

While recording Sonye's information into the dispatch computer, Amador did not include Sonye's statements that she feared for her life or the prior report of Herrera's domestic violence. Based on the family relationship between Sonye and her father and Amador's understanding of the situation, Amador coded the call a "family violence assault," a priority level 4 call. Amador's entries led a police dispatch operator to send out two general broadcasts regarding the incident. No police units immediately responded and soon thereafter, Herrera, who had not actually left the house, shot and killed his wife and daughter.

Manuela Beltran ("Beltran"), Sonye's grandmother, sued the City of El Paso and Amador on behalf of herself and the decedents' estates. The action filed in state court alleged 42 U.S.C. § 1983 violations of the Equal Protection Clause, the Due Process Clause, and the Texas Family Violence Prevention Act,[1]

---

[1] In her initial filing in state court, Beltran sought declaratory judgment on the Texas Family Violence Prevention Act ("FVPA") claims. Before this court, however, as part of her Equal Protection claim under § 1983, Beltran argues that Sonye's and Garcia's statutory rights under the FVPA were violated

3

along with a variety of other state law tort and contract claims. Amador removed the case to federal court and, following discovery, moved for summary judgment on qualified immunity grounds. The district court denied Amador's motion in a one-paragraph order holding that disputed issues of material fact exist as to whether Amador was entitled to qualified immunity. Amador has filed a proper interlocutory appeal.

## II. DISCUSSION

### A. Standard of Review

The court of appeals reviews a district court's denial of summary judgment based on qualified immunity de novo. Hatfield v. Scott, 306 F.3d 223, 226 (5th Cir. 2002). As a general matter, where a district court has found that genuine factual disputes exist in an interlocutory appeal asserting qualified immunity, the court of appeals must accept the plaintiff's version of the facts as true. See Wagner v. Bay City, 227 F.3d 316, 320 (5th Cir. 2000). Nevertheless, where a district court does not set out the factual basis underlying its legal determinations related to a claim of qualified immunity, the court of appeals must review the

by Amador and the City of El Paso. However, such a claim is not cognizable under § 1983 because § 1983 was designed to protect against the violation of <u>federal</u> constitutional and statutory rights, not those created by state statute. <u>San Jacinto Sav. & Loan v. Kacal</u>, 928 F.2d 697, 701 (5th Cir. 1991) ("Violation of a state statute is not actionable under § 1983."); <u>Calhoun v. Hargrove</u>, 312 F.3d 730, 734 (5th Cir. 2002) ("A claim for relief under § 1983 must allege the deprivation of a right secured by <u>the Constitution or laws of the United States</u> by a defendant acting under the color of state law.") (emphasis added).

4

record to determine what facts the district court assumed. See Johnson v. Jones, 515 U.S. 304, 319 (1995).

**B. Qualified Immunity**

The doctrine of qualified immunity serves to shield a government official from liability based on the performance of discretionary functions. Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001). To establish an entitlement to qualified immunity, a government official must first show that the conduct occurred while he was acting in his official capacity and within the scope of his discretionary authority. Cronen v. Texas Dep't of Human Servs., 977 F.2d 934, 939 (5th Cir. 1992). Once a defendant has properly invoked qualified immunity, the burden rests on the plaintiff to show that the defense does not apply. See McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).

Courts apply a two-pronged inquiry to determine whether qualified immunity is applicable in a given case. First, the court must determine whether the plaintiff has alleged a violation of a clearly established federal constitutional or statutory right. See id. at 322-23. Second, the court must determine whether the official's conduct was objectively reasonable in light of the clearly established legal rules at the time of the alleged violation. Id.

**1. Amador's Discretionary Authority**

As a threshold matter, Beltran contends that Amador's position did not involve the type of discretionary decisionmaking authority for which qualified immunity is designed. Beltran argues that a genuine issue of material fact exists concerning whether Amador exercised any measure of discretionary authority in her position as a 911 operator. According to Beltran, Amador holds a purely ministerial position requiring her to transcribe and enter caller-provided information into a computer system in accordance with departmental policies. Beltran contends that Amador possessed neither the requisite education, training or skills to exercise personal deliberation in her job.

Because the district court did not set out the facts it relied upon to determine that genuine issues of material fact existed, we must examine the record below in the light most favorable to Beltran, the nonmoving party, to determine what facts guided the district court. Johnson, 515 U.S. at 319. The record indicates no factual dispute between the parties concerning Amador's education, training, skills, or the actual tasks attendant to her job. Likewise, there is no dispute that Amador was acting in her official capacity during the incident and that, if she had discretionary authority, her actions fell within its scope. Thus, the only disagreement between the parties is whether Amador possessed a sufficient quantum of discretionary authority to be entitled to a qualified immunity defense. To the extent Beltran suggests the facts on this issue are disputed, the discrepancies

6

are not material. For this reason, despite the district court's determination that genuine issues of material fact exist in this action, the order denying summary judgment on qualified immunity is appealable as a legal issue. See Hatfield, 306 F.3d at 225.

Whether viewed as a matter of characterization or of quantification, the evidence demonstrates that Amador exercised crucial discretion in her job. Amador's job appears ministerial to the extent that she is required to transcribe information from callers in a relatively structured manner. But considering the urgency inherent in emergency situations, 911 operators like Amador regularly make a variety of judgment calls. Their principal role is to determine how a particular caller's information should be entered into the system so that it will be useful to emergency service providers. One of Amador's specific tasks is to enter a short statement regarding the "immediate reason" an officer is needed at the scene of the incident. Such determinations are the paradigmatic type of discretionary decisions that law enforcement personnel routinely undertake. Moreover, the parties agree that Amador is required to classify calls based on the facts she gleans in careful conversation with the caller. Indeed, Beltran's equal protection claim centers on the assertion that Amador improperly classified Sonye's call as a priority level 4 "family violence assault" call rather than a priority level 3 "injury to child in progress" call. Amador's responsibility to interpret and then classify and transcribe calls based on the information she obtains,

7

buttresses our conclusion that Amador possessed the necessary quantum of discretionary authority to properly assert qualified immunity.

**2. Existence of a Clearly Established Constitutional Right**

**a. Equal Protection Claim**

Beltran argues that by coding Sonye's 911 call a priority level 4 "family violence assault," rather than a priority level 3 "injury to a child in progress," Amador violated both Sonye's and Garcia's rights to equal protection of the laws under the Fourteenth Amendment.

The "Due Process Clause does not require a State to provide its citizens with particular protective services." DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 197 (1989). Therefore, "a State's failure to protect an individual against private violence does not violate the Due Process Clause." Id. At the same time, however, DeShaney noted that "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." Id. at 197 n.3. This court has cautioned that the Equal Protection Clause should not be used to make an end-run around the DeShaney principle that there is no constitutional right to state protection for acts carried out by a private actor. See McKee v. City of Rockwall, 877 F.2d 409, 413 (5th Cir. 1989) (noting that DeShaney might easily be circumvented if plaintiffs were allowed to

convert "every Due Process claim into an Equal Protection claim, via an allegation that state officers exercised their discretion to act in one situation and not another").

More recently, this court acknowledged that certain intentionally discriminatory policies, practices, and customs of law enforcement with regard to domestic assault and abuse cases may violate the Equal Protection Clause under the DeShaney footnote. See Shipp v. McMahon, 234 F.3d 907, 914 (5th Cir. 2000), overruled in part on other grounds by, McClendon, 305 F.3d at 328-29. While granting qualified immunity on the facts then before the court, Shipp provided an objective standard to inform government officials of the type of conduct that violates federal constitutional or statutory rights. Id. (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)).[2] To sustain a gender-based equal protection challenge under Shipp, a plaintiff must show "(1) the existence of a policy, practice, or custom of law enforcement to provide less protection to victims of domestic assault than to victims of other assaults; (2) that discrimination against women was a motivating fact; and (3) that the plaintiff was injured by the policy, custom or practice." Id.

---

[2] Although Amador failed to mention it in her briefing, the Shipp opinion appeared in its original version in early 2000, just a few months before the events at issue here; Shipp became final in this court in December 2000, see 234 F.3d 907, eight months after Sonye and her mother were killed. For purposes of this discussion, we assume that the first version of Shipp, though later vacated and superseded, was binding in the Fifth Circuit.

After carefully reviewing Beltran's claim in light of Shipp, we conclude that even if El Paso's 911 classification policy improperly subjected "family violence assault" calls to a lower priority than "injury to a child in progress," fulfilling the first Shipp criterion, the evidence does not raise triable fact issues concerning intentional gender-based discrimination or causation, the remaining Shipp criteria.

We assume arquendo that the City's classification policy had an adverse disparate impact on female victims of domestic violence, but the weakness of this assumption should be noted. There is no statistical or even anecdotal evidence in the record that women were systematically shortchanged or deprived of effective law enforcement response by the City's 911 policies. More significantly, the City's policy seems to embody a distinction in Texas criminal law between distinct types of assault cases.[3] The City's policy, at one level, appears, not irrationally, to

---

[3]     Texas defines family violence assault as an assault where "the offense is committed against . . . a member of the defendant's family or household." TEX. PEN. CODE ANN. § 22.01(B)(2) (VERNON 2003). Assault, in turn, may be committed by "(1) intentionally, knowingly or recklessly caus[ing] bodily injury to another, including the person's spouse; (2) intentionally or knowingly threaten[ing] another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly caus[ing] physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." Id. at § 22.01(a).  In contrast, "injury to a child" is defined under Texas law as "intentionally, knowingly, recklessly or with criminal negligence, by act, or intentionally, knowingly or recklessly by omission, caus[ing] to a child . . . (1) serious bodily injury; (2) serious mental deficiency, impairment or injury; or (3) bodily injury." Id. at § 22.04(a).  Thus, under Texas law, for an "injury to a child" to be "in progress," an individual must be causing, either by act or omission, some type of actual injury to a child.  On the other hand, for a "family violence assault" to be taking place, an individual may be causing bodily injury to a family or may simply be threatening a family member with imminent bodily injury.

10

track the relative severity of assaults defined by state criminal law.  At another level, however, the commonsense notions of injury in progress and assault suggest overlap depending on the nature of the injury or assault and leave room for the 911 operator's exercise of non-gender-influenced judgment.  Either way, no adverse disparate impact on women is foreordained by the classification policy.  But we afford Beltran the benefit of the doubt here, since the other criteria of a Shipp claim are so obviously wanting.

Shipp held that a plaintiff must show that discrimination against women is the "motivating factor" behind governmental policies that are alleged to be improper; consequently, "law enforcement officials will only be liable for those policies . . . that are the product of invidious discrimination."  Id. (emphasis added).  Beltran has made no showing that the City of El Paso assigns a lower level priority code to 911 family violence assault calls as the result of an effort to discriminate against women. Without evidence of discriminatory intent, Beltran cannot argue that the mere existence of such a policy violates the Equal Protection Clause.  See id. (noting that even where a plaintiff brings forth "statistical evidence showing disproportionate impact [that] is probative on the issue of gender-based motivation, such evidence without a showing of intent is insufficient to sustain an equal protection claim").

The only evidence of allegedly improper motivation that Beltran puts forward is that during the 911 call, Amador asked

11

Sonye whether it was her husband or her boyfriend that was threatening her, and during her deposition, Amador suggested that had there been no family relationship between Sonye and Herrera, she might have been able to use the injury to a child in progress code. Amador's statements must be viewed in context. According to the transcript of the 911 call, at the time Amador asked Sonye about her relationship to her attacker, all that Amador knew was that Sonye was in her home and that she feared attack by a male assailant. Amador's question regarding the nature of the relationship between Sonye and her assailant is better understood as an eminently reasonable question that an emergency operator might ask to assess the situation at hand, rather than an attempt to discriminate against Sonye or her mother based on their relationship to the attacker. Similarly, Amador's statement that she "_could_ have used the injury to a child in progress" code had there been no family relationship does not imply that she _would_ have used the injury in progress code. The transcript of the 911 call indicates that when Sonye made her call, her father had not yet actually physically attacked her. Further, she was not necessarily in immediate danger of physical harm because she was hiding in a locked bathroom. When Amador asked Sonye whether her father was trying to hit her or if he was just arguing with her, Sonye responded only that her father had been drinking and that he was "restraining himself from hitting" her. Amador's question was directly related to determining whether Sonye was actually being

12

injured, a fact which might have led Amador to use the injury in progress code rather than the family violence assault code. When Amador completed the call, however, it appeared that Herrera had left the premises. These facts, taken as a whole, demonstrate that Amador was gauging the potential danger in Sonye's situation; they do not imply any measure of discriminatory intent on Amador's part.

Beltran has also shown no direct causal link between the victims' deaths and the City of El Paso's policy as carried into practice by Amador. This court noted in Shipp that a causation requirement is crucial to ensure that law enforcement officials are not held to account for "generalized harms that are not traceable to their . . . policies" or for injuries that "are solely attributable to the perpetrators of the underlying domestic assault." 234 F.3d at 914. Such a requirement is reinforced by the Supreme Court's recognition that "discretion is essential to the criminal justice process." See McCleskey v. Kemp, 481 U.S. 279, 297 (1972). Law enforcement officials must have "the flexibility and discretion to adopt and employ policies that are tailored to address the special concerns that domestic assault cases raise without compromising the protective services that law enforcement provides." See Shipp, 234 F.3d at 914.

Thus, an equal protection plaintiff must show that her injuries are the result of law enforcement "inaction or conduct pursuant to invidious policies." Id. However, Beltran provides no evidence that the police would have responded any more quickly if

13

Amador had coded the call as an injury to a child in progress. The lack of immediate police response to the family violence assault bulletin is not probative of whether the units would have responded more expeditiously to an injury to a child in progress call. Even if Beltran could show that the police would have responded more quickly to an injury to a child in progress call, there is no evidence that the police would have arrived in time to save Sonye or Garcia. Without such evidence, it is difficult, if not impossible, to determine whether police delay or inaction in response to the family violence assault bulletin was the cause of Sonye's and Garcia's deaths.

Given the dearth of evidence presented by Beltran to support her case under Shipp, the facts of this case, even viewed in the light most favorable to the plaintiff, show no violation of Sonye's or Garcia's rights under the Equal Protection Clause, much less of any clearly established rights in the circumstances that confronted Amador.

### b. Due Process Claim

Beltran also contends that Sonye's substantive due process rights were violated by Amador because Amador falsely promised police services that Sonye relied on to her detriment. As was noted earlier, the "Due Process Clause does not require a State to provide its citizens with particular protective services." DeShaney, 489 U.S. at 197. Therefore, "a State's failure to pro-

14

tect an individual against private violence does not violate the Due Process Clause." Id. However, DeShaney recognized that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198 (emphasis added). Such "special relationship" cases arise when the state, "through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf." See McClendon, 305 F.3d at 323.

Beltran argues that by encouraging Sonye to stay in the bathroom and telling her that the police were on the way, Amador became the custodian of Sonye's safety. This argument falls outside of the special relationships described by the Supreme Court, which are limited to cases concerning "incarceration, institutionalization, or other similar restraint of personal liberty." DeShaney, 489 U.S. at 200. In this case, Amador offered advice to Sonye, but she did not affirmatively place Sonye in custody by restraining her in the bathroom. This might have transpired if Amador had been present in the house and locked the bathroom door from the outside, but we decline to speculate on this counterfactual possibility.

Beltran alternatively contends that Amador, by providing Sonye with inaccurate information about the status of the patrol units and recommending that she stay in the bathroom, created a dangerous situation for which the state was or should be

15

responsible. This court has consistently refused to recognize a "state-created danger" theory of § 1983 liability even where the question of the theory's viability has been squarely presented. See, e.g., McClendon, 305 F.3d at 327-333; Scanlan v. Texas A&M Univ., 343 F.3d 533, 537 (5th Cir. 2003) (same). It is unnecessary to do so in this case.

Even if a state-created danger theory were acknowledged in this circuit, in order for Amador to be held liable, Beltran must show that Amador acted with "deliberate indifference" to Sonye's situation. See McClendon, 305 F.3d at 326; Scanlan, 343 F.3d at 537-38. Deliberate indifference requires that the state actor both knew of and disregarded an excessive risk to the victim's health and safety. McClendon, 305 F.3d at 326, n.8. In McClendon, this court held that a defendant police officer who lent a gun to an informant was not deliberately indifferent toward a third-party that the informant shot with the officer's gun. Id. at 326-27. Rather, this court held that the officer was negligent. Id. The only facts presented by Beltran that even remotely suggest misfeasance are (1) Amador's failure to record the previous Herrera family injury to a child incident in the dispatch report; (2) her statement to Sonye that the police were on their way; (3) the advice Amador provided to Sonye to stay in the bathroom; and (4) Amador's disconnecting of the phone call. Given Amador's understanding that (1) a radio call was going out to patrol cars based on her report, (2) the locked bathroom was a relatively safe

16

place, and (3) Herrera was leaving the scene, she did not display deliberate indifference to Sonye's situation. She had no reason at that point to know that Sonye's life was in immediate danger. Moreover, rather than disregard the threat, it appears that Amador was doing what she could to keep Sonye safe. Her errors constitute negligence, not deliberate indifference.

For these reasons, Beltran's due process claim does not fall within the narrow exceptions to DeShaney's holding that state actors may not be held responsible for private violence. See DeShaney, 489 U.S. at 197. In the absence of a violation of a clearly established constitutional right, Amador is entitled to qualified immunity as a matter of law.

### c. Objective Reasonableness

Even if Beltran had established a viable constitutional claim under her Equal Protection or Due Process theories, Amador's conduct was objectively reasonable in light of the clearly established legal rules at the time of the incident, and qualified immunity protects her from any civil liability. See McClendon, 305 F.3d at 327. This court has held that "qualified immunity is a shield from civil liability for 'all but the plainly incompetent or those who knowingly violate the law.'" See Jones v. City of Jackson, 203 F.3d 875, 883 (5th Cir. 2000) (quoting Malley v. Briggs, 475 U.S. 335, 341). Indeed, even officials whose conduct "violates some statutory or administrative provision" do not

17

necessarily lose their qualified immunity.  <u>See</u> <u>Davis v. Scherer</u>,
486 U.S. 183, 194 (1984).  Reviewing the record in the light most
favorable to the plaintiff, we find that Amador's actions were
objectively reasonable as a matter of law.  Even accepting
Beltran's assertion that Amador violated internal department
policies with respect to the amount and content of data to be
entered into the 911 system, and that other operators might have
handled Sonye's call differently, there is no basis in the record
for suggesting that Amador knowingly violated the law or that she
was plainly incompetent.

### III.  CONCLUSION

For the reasons discussed above, we **REVERSE** and **REMAND**
with instructions to the district court to grant summary judgment
in favor of Amador on her qualified immunity defense with respect
to these federal constitutional claims.[4]

---

[4]     Amador also discusses a variety of state law tort and contract claims
brought by Beltran.  However, the interlocutory order on appeal here did not
reach these issues, but dealt only with the question of summary judgement on
qualified immunity grounds.  As a result, these issues are not properly before
this court on interlocutory appeal.  <u>See</u> <u>Felton v. Polles</u>, 315 F.3d 470, 474 (5th
Cir. 2002) (noting the existence of jurisdictional limitations on interlocutory
appeals from a denial of  summary judgment on qualified immunity grounds); <u>Meyer
v. Austin Indep. Sch. Dist.</u>, 161 F.3d 271, 272 (5th Cir. 1998) (same).

18