**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 21, 2006**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-41052

ADAM LONGORIA,

Plaintiff-Appellee,

versus

STATE OF TEXAS, ET AL.,

Defendants,

DAVID HUDSON, Assistant Warden;
DONNA JOHNSON, Individually and in her official capacity;
RONALD STAFFORD; MICHAEL PEACOCK, Officer, Individually and in
his official capacity; JERRY ROGERS, Officer;
HERBERT FARR, Individually and in his official capacity;
PAUL STAGGS, Officer; LIEUTENANT ZELDA GLASS, Individually
and in her official capacity,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Texas
No. 5:02-CV-112

Before JONES, Chief Judge, and REAVLEY and PRADO, Circuit Judges.

EDITH H. JONES, Chief Judge:

Inmate Longoria, who was stabbed by fellow inmates for being a "snitch," sued various Texas prison officials for constitutional and state-law violations arising from the attack. In this interlocutory appeal from denial of Defendants' motion for summary judgment based on qualified immunity, we **REVERSE IN PART AND DISMISS IN PART**. The district court erred in failing to assess

the degree of participation of each prison official individually, and most of them — Officers Farr, Glass, Peacock, Rogers, Stafford and Staggs — were entitled to qualified immunity, as a matter of law.

## I.   BACKGROUND

We recite the facts as depicted in appropriate summary judgment evidence.

After midnight on May 27, 2000, Appellee Adam Longoria, a prisoner at the Texas Department of Criminal Justice's ("TDCJ") Telford Unit, was stabbed twenty-eight times by fellow inmates David Peralez and George White.[1]  Due to their suspected membership in the Texas Syndicate ("TS") prison gang, Longoria, Peralez, and White were housed near one another in a lockdown unit (or "pod") because of recent hostilities that had broken out between the TS and a rival gang.

After inspecting the toilet and shower area for weapons, Officers Farr and Staggs strip-searched inmates Peralez and White and took them to the third-tier shower area.  Shortly thereafter, Officer Rogers removed Longoria from his cell in order to escort him to a routine lockdown interview.  Longoria claims he told Rogers that Peralez and White were in the showers and wanted to

---

[1]Longoria completed his term at Telford and was released. He has subsequently reoffended and is now incarcerated at the TDCJ's McConnell facility in Beeville, Texas.  All events relevant to this appeal occurred during his incarceration at Telford.

kill him.  Rogers allegedly assured Longoria that if anything happened he would be protected.  Officer Rogers then handcuffed him and removed him from the cell.

As Longoria and Officer Rogers walked along the corridor, Peralez and White emerged from the showers armed with shanks and began running toward them.  Longoria fled.  Although unarmed,[2] Rogers initially attempted to stand between Longoria and his attackers, but was pushed aside as they chased Longoria.  Officers Farr and Staggs, who were inspecting Peralez's and White's cells for contraband, heard the commotion, were approached and threatened by White, and ran away to alert other guards and obtain weapons and tear gas.

Peralez and White chased Longoria through the now-sealed pod,[3] tackled him and began stabbing him in the chest and neck.  Longoria finally broke free and fled to the first-floor common area where he collapsed and was met by arriving officers.  He was seriously injured.

Longoria was likely targeted by the TS because he had become a jailhouse informant.  On several occasions in the months preceding the attack, Longoria had provided gang-related

_____

[2]Guidelines promulgated by the TDCJ at the time prohibited officers assigned to lockdown duty from carrying weapons.

[3]In case of a disturbance in the pod, the picket officer is instructed to seal the unit.

information during meetings with investigators from the Security Threat Group ("STG") and the Internal Affairs Division ("IAD").

Major Hudson[4] instructed STG Officer Johnson to interview Longoria on two occasions, March 15 and March 22, 2000, concerning an attack on another gang member ordered by the TS. Longoria admitted that he had been a TS prospect since his arrival at Telford, but he no longer desired to be associated with the gang. Longoria did not express any fear for his safety or request a life-endangerment investigation during these interviews, but did request to be removed from lockdown because he was no longer affiliated with the TS. Officer Johnson, however, had obtained information from the prison administration that Longoria had been a TS leader at the Willacy Unit and had a history of manipulative and "slick" behavior. Based on Officer Johnson's reports, Major Hudson discounted much of Longoria's information and, because he was a TS member, kept him on lockdown status.

A few weeks later, Longoria again contacted prison officials and offered information about the murder of a TS member. After briefing Officer Scott and IAD Officer Stafford, Longoria again requested to be removed from lockdown, stating that he was not a TS member and felt that his life would be endangered if other inmates were to learn that he was meeting with prison officials.

_____

[4]At the time of the events pertinent to this appeal, David Hudson was a major at the Telford Unit, a position that he held since March 2000. On June 1, 2000, he was promoted to assistant warden.

4

Major Hudson was then informed of the meeting by Officer Scott but decided to take no action to rehouse Longoria.

In the days following his meeting with Scott and Stafford, Longoria had made several additional written requests to be removed from lockdown. In neither of his letters dated April 2 and May 22[5] did Longoria express any concern for his safety.

Longoria claims, however, that he sent at least two additional letters sometime in early May to Major Hudson and Officers Scott and Johnson in which he made life-endangerment claims and stated that TS members knew of his meeting with Officers Scott and Stafford and had ordered a revenge "hit" on him. Major Hudson attested that neither of these letters were found in Longoria's casefile, nor could Hudson confirm that any prison officials received these letters.

On May 26, 2000 — the day of the attack — Longoria approached Sergeant Vann in the pod's common area and informed her that the TS was planning to murder him. Longoria requested a life-endangerment investigation, immediate removal from lockdown, and reassignment to protective housing. In response to Longoria's assertions, Vann telephoned STG Officer Johnson, who at the time of the call was processing a large group of newly arrived inmates. Johnson halted her intake interviews and told Vann that she would

---

[5]Although Longoria claims he did not write the May 22 letter, it appears to bear his signature and handwriting, and it denies he had any problems with TS members.

5

contact Officer Glass, a member of the Inmate Classification Committee, to make a determination concerning the validity of Longoria's life-endangerment claim.

Officer Johnson then consulted with Officer Glass, who recommended that since Longoria notified Sergeant Vann of his claims, it was ultimately Vann's responsibility to initiate a life-endangerment investigation. Following Glass's instructions, Johnson told Vann to initiate an investigation if Vann determined that one was necessary. Johnson then passed the telephone to Officer Glass, who informed Vann to proceed with an investigation if Longoria had a legitimate claim. Glass further explained to Vann that, because neither Glass nor Johnson was authorized to reassign Longoria to a new cell, Vann needed to contact Major Gray. After unsuccessful attempts to locate Major Gray, Vann notified the ranking security officer on duty, Captain Langley, of Longoria's claim and explained that Longoria was a TS member currently relegated to lockdown status. Because of the minimal exposure to other inmates that Longoria would have on lockdown status, Langley determined that immediate housing reassignment was not necessary and that a life-endangerment investigation should be undertaken prior to any change in Longoria's assignment. Early the next morning, the attack occurred.

Longoria brought suit under 42 U.S.C. § 1983 against the State of Texas, TDCJ,[6] Major Hudson, Officers Farr, Glass, Johnson, Peacock,[7] Rogers, Stafford, and Staggs. Narrowing Longoria's claims to those of failure to protect and state-created danger, the district court denied Defendants' motion for summary judgment based on qualified immunity. All of the officers have appealed.

## II.  DISCUSSION

Government officials performing discretionary functions are entitled to qualified immunity from civil liability to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). For qualified immunity purposes, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Johnson v. Johnson, 385 F.3d 503, 524 (5th Cir. 2004) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands

---

[6]Defendants State of Texas and TDCJ were subsequently dismissed from this lawsuit for lack of subject matter jurisdiction pursuant to the Eleventh Amendment.

[7]Longoria now admits that Defendant Peacock was fallaciously named as a party and is not involved in any of the events that precipitated this lawsuit. The parties agree that Officer Peacock was not on duty at the time of the assault.

7

of their fellow inmates.  See Farmer v. Brennan, 511 U.S. 825, 832-33, 114 S. Ct. 1970, 1976-77 (1994).[8]  Under Farmer, an inmate "must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials were deliberately indifferent to an inmate's safety.  Id. at 834, 114 S. Ct. at 1977.  An official acts with the requisite deliberate indifference if he is aware of an "excessive risk to inmate...safety" and disregards that risk.  Id. at 837, 114 S. Ct. at 1979.  In this context, an officer's awareness of the risk is evaluated subjectively.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must in fact also have drawn the inference.  Id.  No liability exists, however, if an official

---

[8]Longoria also argues that his rights were violated under a state-created-danger theory.  This circuit has never sustained a § 1983 claim predicated upon the state-created danger theory, and we decline to do so today.  See, e.g., Rios v. City of Del Rio, Tex., 444 F.3d 417, 422-23 (5th Cir. 2006); McClendon v. City of Columbia, 305 F.3d 314, 329-33 (5th Cir. 2002) (en banc), cert. denied, 537 U.S. 1232, 123 S. Ct. 1355 (2003); Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 530-32 (5th Cir. 1994).  Moreover, the district court's intimation that our decision in Scanlan v. Texas A&M Univ., 343 F.3d 533 (5th Cir. 2003), provides a potential basis for Longoria's novel state-created-danger claims is incorrect.  Since Scanlan, we have explicitly rejected this theory of liability.  See Rios, 444 F.3d at 422-23; Beltran v. City of El Paso, 367 F.3d 299, 307 (5th Cir. 2004); Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 249 (5th Cir. 2003).  Because Longoria was in state custody, Longoria's claim is fully subsumed by the Eighth Amendment.  The district court therefore erred in denying summary judgment under the state-created-danger.

8

reasonably responded to a known substantial risk, "even if the harm was ultimately not averted." Id. at 844, 114 S. Ct. at 1983.

The district court predicated its denial of summary judgment on the existence of disputed material facts, including the authenticity of the May 22 letter, the amount of notice given by Longoria to the responsible prison officials, their responses to this notice, and the events on the morning of the attack. Because the standard outlined by Farmer requires an evaluation of both subjective knowledge and objective reasonableness, the court erred in using these factual disputes as a blanket justification for denial of summary judgment to the defendants as a class, without further considering their individual roles in the disputed incidents. When, as here, the district court does not explain with sufficient particularity the factual basis justifying a denial of qualified immunity, an appellate court must examine the record, and it becomes our task to determine whether, when viewing the facts in the light most favorable to Longoria, each defendant was entitled to qualified immunity. Johnson v. Jones, 515 U.S. 304, 319, 115 S. Ct. 2151, 2159 (1995); Beltran v. City of El Paso, 367 F.3d 299, 302 (5th Cir. 2004).

## A.   Officers Farr, Staggs, and Rogers

Longoria asserts that pod officers Farr, Staggs, and Rogers were either deliberately indifferent to his safety or actually participated in or aided Peralez and White in the attack.

9

First, other than the mere assertion itself, Longoria offers absolutely no evidence to suggest that these officers conspired in any way with TS members in planning Longoria's stabbing. We accordingly disregard this aspect of his claim. See Behrens v. Pelletier, 516 U.S. 299, 304, 116 S. Ct. 834, 838 (1996) ("nebulous theories of conspiracy" cannot sustain summary judgment) (internal quotation marks omitted); Warfield v. Byron, 436 F.3d 551, 557 (5th Cir. 2006) ("conclusory allegations" or "unsubstantiated assertions" do not create a fact issue on summary judgment) (citation omitted).

Next, Longoria argues that because Farr, Staggs and Rogers were present in the pod at the inception of the attack, their failure to intervene abdicated their duty to protect him and amounted to deliberate indifference. Pursuant to Texas Department of Criminal Justice policy at the time of the incident, officers tasked with escorting lockdown-status inmates to and from their cells do not carry weapons.[9] Instead, in the event of an armed attack between inmates, officers are instructed, first, to insure

---

[9]The officers did, however, violate a directive dated August 19, 1999, from Major Powell which required that no more than two inmates be removed from their cells at one time during lockdown. Deviation from policy alone might support a negligence claim, but is insufficient by itself to support an argument for deliberate indifference with respect to Farr, Staggs, and Rogers. Irrespective of the lockdown policy, escorting an inmate out of lockdown while other inmates, who were strip-searched and are showering in an area that also had been searched, is not itself unreasonable.

10

their own safety by leaving the pod and, second, to obtain armed reinforcements.

Longoria in effect asks this court to fashion a new Eighth Amendment rule that would require unarmed prison guards to physically intervene in altercations between armed inmates or risk being found deliberately indifferent. Although we have previously held that an officer's failure to take reasonable measures to protect a suspect from excessive force can give rise to § 1983 liability, see Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995); Harris v. Chanclor, 537 F.2d 203, 205-06 (5th Cir. 1976), no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence. The officers violated no "clearly established" law by failing to intervene while unarmed.

Finally, there is no evidence that Farr, Staggs, or Rogers were aware of Longoria's activities as an informant, that he had previously requested to be removed from lockdown, or that he had made a life-endangerment claim to Officer Vann on the evening before the attack. Officer Rogers thus did not act unreasonably when he escorted an unwilling Longoria from his cell while Longoria was warning that the inmates in the shower wanted to kill him. Because neither Farr, Staggs, nor Rogers had any knowledge of a substantial threat to Longoria's safety, as a matter of law they did not act with deliberate indifference. The district court

11

therefore erred in denying these officers summary judgment based on qualified immunity.

**B. Officer Glass**

Longoria asserts that Officer Glass acted with deliberate indifference to his safety because she failed to take any steps to protect him after she was made aware of his life-endangerment claim by Officers Johnson and Vann. But he offers no evidence that Officer Glass had any knowledge of his communications with prison officials or his asserted fears of attack prior to May 26, 2000. Even assuming that Officer Glass did have knowledge of his history as an informant, there is no Eighth Amendment violation because the undisputed facts demonstrate that she responded reasonably to the life-endangerment referral from Officers Johnson and Vann. Officer Glass was not authorized to order an immediate housing reassignment for Longoria and informed Officer Vann that, if appropriate, Vann should contact an officer authorized to do so. We have previously held that responding to an inmate's complaints "by referring the matter for further investigation" or taking other appropriate administrative action fulfills an official's protective duties under the Eighth Amendment. Johnson, 385 F.3d at 526. Officer Glass's conduct thus did not violate clearly established law at the time of the attack and entitled her to qualified immunity.

**C. Officer Stafford**

Similar to the claims he makes against Officer Glass, Longoria asserts that Officer Stafford failed to adequately protect him from attack by Peralez and White and disregarded a substantial risk to his safety. Longoria's only contacts with Stafford occurred several months before the attack, when he sent information regarding the Ramirez murder to Officers Scott and Stafford on an I60 reporting form and later met with him. There is no evidence that Stafford was aware of the life-endangerment claims nor has Longoria shown that Stafford knew that TS members had learned of their meeting. The mere fact that Stafford knew Longoria was operating as an informant is insufficient to prove that Stafford had knowledge of a substantial risk to Longoria's safety by the TS. See Adames v. Perez, 331 F.3d 508, 514 (5th Cir. 2003) (stating under virtually identical circumstances that an officer to whom an informant divulges information is entitled to qualified immunity unless it can be shown that the officer knew that the inmate's status as an informant had been revealed). Longoria's deliberate indifference claim against Stafford thus fails because there is no indication that Stafford's conduct was unreasonable. The district court erred in denying qualified immunity to Officer Stafford.

## D. Major Hudson and Officer Johnson

Both Major Hudson and Officer Johnson were aware of Longoria's activities as an informant from the inception of the period pertinent to this lawsuit. Although Longoria never provided

information regarding the TS directly to Hudson, Hudson was informed by Officers Johnson and Scott that Longoria was an informant supplying information about "hits" involving TS members.[10] Additionally, Hudson instructed Officer Johnson to conduct interviews with Longoria on March 15 and March 22, 2000. Johnson claims that Longoria did not request a life-endangerment investigation at either of these meetings and that she had no knowledge that Longoria was scheduled for another interview on the day of the stabbing. Neither Hudson nor Johnson could confirm that they received or reviewed the various letters Longoria claims to have written in which he requested a life-endangerment investigation in the weeks prior to the attack. Major Hudson testified that he had no knowledge of Longoria's May 26 life-endangerment request.

Whether a prison official had knowledge of a substantial risk to inmate safety is a question of fact over which this court lacks jurisdiction. See Farmer, 511 U.S. at 842, 114 S. Ct. 1981; Smith v. Brenoettsy, 158 F.3d 908, 912 (5th Cir. 1998). As the

_____

[10]On one occasion, while conducting rounds, Major Hudson admits that he could have possibly spoken with Longoria regarding the alleged location of weapons stashed in the prison. Longoria, in contrast, testified regarding the same brief meeting: "so, I'm sitting on top of my bunk looking at the Warden – I mean, the Major – excuse me. And I was telling him – I was – I was making sign language that I need to talk to him and I kept on telling him they are going to kill me in sign language. And he looked at me and, he said, 'Okay.' Well, when he left, I never heard from him." Apart from this disputed incident Hudson never met with Longoria or interviewed him.

14

district court observed in its order denying summary judgment, material issues of fact exist with respect to the authenticity of Longoria's correspondence and the amount of notice he provided to prison officials in the weeks before the attack. If Hudson and Johnson had indeed received repeated warnings from Longoria, including the currently unauthenticated letter in which Longoria details the TS plot to kill him and his fear of remaining in lockdown with his putative murderers, they might have been aware of facts from which inferences suggesting deliberate indifference could be drawn. Consequently, we have no jurisdiction to address this issue on interlocutory appeal. See Smith, 158 F.3d at 912-13 (dismissing interlocutory appeal for lack of jurisdiction when material fact issues existed regarding whether the existence and contents of certain letters put prison officials on notice of a substantial risk to inmate safety).

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of summary judgment on qualified immunity grounds with respect to Officers Farr, Glass, Peacock, Rogers, Stafford and Staggs, and dismiss the appeal with respect to Major Hudson and Officer Johnson for lack of jurisdiction.

**REVERSED IN PART; DISMISSED IN PART.**

15