# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 1, 2008

Charles R. Fulbruge III
Clerk

No. 07-40227

REGINA KELLEY, Individually and as Guardian and Next of Friend of IMARI
KELLEY and JADEN KELLEY; BYRON HALL,

Plaintiffs-Appellants,

v.

CITY OF WAKE VILLAGE, TEXAS; CHIEF OF POLICE TONY ESTES, In his
Individual and Official Capacity; OFFICER RUSSELL CRAWFORD, In his
Individual and Official Capacity,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:04-CV-137

Before GARZA, STEWART, and OWEN, Circuit Judges.

PER CURIAM:[*]

Regina Kelley ("Kelley") and her brother, Byron Hall, sued the City of
Wake Village, Texas ("the City"), Chief of Police Tony Estes, and Officer Russell
Crawford (collectively "Defendants") alleging, inter alia, that the West Village
Police Department ("WVPD") failed to follow state law as well as departmental
policy regarding domestic violence victims, and that, as a result, her rights

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

under the Equal Protection Clause of the Fourteenth Amendment were violated. Defendants moved for summary judgment; their motion was granted by the district court. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

We recite the facts in the light most favorable to Plaintiffs, the party opposing summary judgment. On November 3, 2002, Officer Russell Crawford of the Wake Village Police Department ("WVPD") responded to a dispatch of possible family violence at the home of Regina and Jerod Kelley, a married couple who lived in Wake Village, a small community just outside of Texarkana, Texas. Kelley complained to Officer Crawford that Jerod had physically assaulted her while her children were present. In her deposition, Kelley testified Officer Crawford told her to shut up or else her children would be taken away from her. However, Officer Crawford arrested Jerod that evening based on an outstanding warrant, although Jerod was released that same night. Two days later, he was arrested again on an assault charge stemming from the November 3 incident. Shortly thereafter Kelley and Jerod separated, and Hall moved into the residence. Kelley also alleges that she had a protective order filed against Jerod.

On January 21, 2003, Kelley contacted the WVPD and reported that Jerod was sitting outside of her residence in a vehicle, in violation of the protective order. By the time the police arrived, Jerod was no longer present. Ten days later, Kelley called the WVPD and reported that Jerod had put sugar in the gas tank of her car. The WVPD officer who responded advised her that the car was community property and that no crime had been committed. Kelley called back later that night, stating that Jerod was unlawfully in front of the house. Pam Bradley, Kelley's mother, testified in her affidavit that a WVPD officer told Kelley that she could either stay in the house with Jerod or take the children and leave. Bradley also testified that the officer told Kelley that if she did not

stop calling the police department her children would be taken away from her by the Department of Human Services. On February 10, 2003, Kelley called the police after Jerod had pointed his finger in a gun-like manner at her head and threatened that he was going to shoot her. Susan Kelley, Jerod's mother, testified in her affidavit, that the WVPD officer who responded told Kelley that if she continued calling about domestic violence the Department of Human Services would take her children away.

On February 13, 2003, Jerod was arrested for assaults by threat, and that same day, Justice of the Peace Nancy Tallet issued a temporary emergency protective order for Kelley against Jerod, which was entered in the Texas Crime Information Center/National Crime Information Center ("TCIC/NCIC") database. However, the WVPD never received a copy of the order, and it is undisputed that the WVPD computer system does not have access to the TCIC/NCIC criminal reporting system database.

On February 28, 2003, a WVPD officer responded to a dispatch of criminal trespass at the Kelleys' residence. Even though Jerod was not found on the premises, the officer noted that a temporary protective order had been issued. On March 22, 2003, Officer Crawford responded to a dispatch that Jerod had violated the protective order by coming to the residence and harassing Kelley, although once again, Jerod was not found on the premises.

On April 11, 2003, Judge Leon Pesek, Jr. of the Bowie County Court issued another protective order for Kelley against Jerod; this ordered was forwarded to Chief Estes on April 14, 2003. During this time period and over the following weeks, Kelley made several other phone calls to the WVPD complaining about Jerod's threatening and harassing behavior, which was in violation of the protective orders.

On July 27, 2003, at approximately 11:30 PM, Kelley called the WVPD explaining that Jerod had come to the residence, grabbed her by the neck, and

3

threatened to kill her if she ever left him. Hall fought with Jerod, and Jerod then left the residence. Officer Hadaway searched the immediate area, but could not locate Jerod. Officer Hadaway told Kelley to stay in the house and call 911 if Jerod returned. He also reported a violation of the protective order before he began searching for Jerod.

Approximately one hour later, WVPD Officers Hadaway and Shutte were dispatched back to the residence regarding a call of vandalism in progress. When they arrived, they found a man, Booker Williams, shot and dead in the street in front of the house. Kelley had also been shot twice and was wounded, and the officers discovered that Jerod was in the house and was holding four children hostage. Chief Estes instructed the officers to contact the Texarkana Metro SWAT and Hostage Negotiations Team. At 1:23 PM on July 28, 2003, the SWAT team entered the house and safely retrieved the children; Jerod committed suicide in front of the children. While Kelley was hospitalized, the Department of Human Services placed her children in foster care.

Kelley subsequently brought suit against Defendants pursuant to 42 U.S.C. §§ 1983 and 1988, alleging: (1) a substantive due process claim based on a "special relationship" between her and Defendants, imposing an affirmative duty to protect; (2) an equal protection claim based on law enforcement policies and practices towards victims of domestic violence; (3) negligence and gross negligence claims under the Texas Tort Claims Act; and (4) a claim of intentional infliction of emotional distress. On March 9, 2005, the district court dismissed all of Kelley's claims except her gender-based denial of equal protection against the City and the two named defendants in their official capacities. Defendants then moved for summary judgment on the remaining claim.

Defendants contested Kelley's argument that the WVPD selectively denied its police protective services to women who had been victims of domestic violence, highlighting that no other woman, besides Kelley, complained of

inadequate police protection from family violence during the relevant time period. Officer Crawford presented deposition testimony where he discussed the family violence training he had received, and explained the protocol that officers are supposed to follow when there is an allegation that a protective order has been violated.[1] He testified that he was aware of the history of domestic violence between Regina and Jerod Kelley, even though he stated he was not aware of the protective order when he responded to the call on March 22, 2003. Chief Estes testified that he has always ensured that all of his officers have complied with the training requirements established by the Texas Commission of Law Enforcement Officer Standards and Education ("TCLEOSE"). He agreed that in domestic violence situations, the WVPD is legally required to submit incident reports to the Department of Public Safety (DPS), whether or not an arrest is effectuated, and he acknowledged that such reports were not always filed regarding the Kelleys.

Defendants also presented the expert report of Albert Rodriguez, the Commander of the Training Academy for the DPS. In his report, Rodriguez provided statistics that the WVPD received 419 calls[2] from August 2000 through July 13, 2003, 44 of which were for family violence. 58 people were arrested or summoned during this period, 24 of which were arrested for family violence. Rodriguez interpreted the data to indicate that approximately 41% of all arrests

---

[1] Specifically, he testified that first the officer must verify the existence of the order. If there is in fact a protective order and the alleged offender is on the scene, the officer can arrest him. If the alleged offender is not present, the officer must use reasonable means to track him down, particularly if the officer is aware of a previous history of family violence.
Further, he testified that if the officer believes the allegations of the victim the officer is required to take a report from the victim and get statements and warrants. Officer Crawford acknowledged that Chief Estes never provided any instruction about how much effort should be used to locate an alleged offender, and also that he never received any training regarding the Wake Village family violence policy.

[2] In conducting his analysis, Rodriguez only looked at the following offense categories: assault, criminal mischief, criminal trespass, and family and domestic violence. He received his data by looking at the police chief's monthly reports ("PCMRs").

were for family violence, and approximately 54% of all family violence calls resulted in arrests. He also stated that all offenders arrested for family violence were male, all the victims were female, and that 20 of the 48 cases that were referred for prosecution in the relevant time period were for family violence. Based on these numbers, he concluded that there was no factual basis for Kelley's allegation that the WVPD had any discriminatory customs or policies towards women who have been victims of family violence. Further, he argued that even if the procedural violations of Texas law alleged by Kelley were true and even if she could prove that certain officers failed to enforce the protective orders, there is no evidence that WVPD had a custom or policy approving or condoning such behavior.

In response, Kelley argued that the evidence establishes that the WVPD did not enforce the protective orders which had been issued because not only should Jerod have been investigated, interviewed, or arrested after he repeatedly violated the protective orders, but also the WVPD failed to fill out Family Violence DPS reports, as they were required to do, for many of the incidents leading up to July 27, 2003. She asserted that this lack of enforcement indicates a custom, policy, or practice of Defendants to provide less police protection to victims of domestic assault than other victims. Kelley also provided the expert report and deposition of Sandy Kline, a retired sergeant with the Houston Police Department. According to Kline, the WVPD repeatedly failed to follow numerous provisions of the then-existing Texas Penal Code, Family Code, and Code of Criminal Procedure, as well as its own departmental policies regarding the handling of family violence incidents. After reviewing a number of offense reports prepared by the WVPD, Kline reported that the WVPD had a "consistent pattern [of] ignoring or minimizing allegations of family violence," and that such a pattern was evident in the reports related to the Kelleys. Kline also took issue with the data used by Rodriguez, contending that he

underreported the total number of arrests and calls within the relevant time period.[3] She concluded that the WVPD's "practices, customs, and unwritten policy in the disparate treatment of family violence victims has a chilling effect of denying equal protection of the law to family violence victims."

The district court granted Defendants' motion, and ordered all of Kelley's claims to be dismissed with prejudice. Kelley timely filed her notice of appeal.

## II. DISCUSSION

### A. Standard of Review

We review the district court's grant of Defendants' motion for summary judgment de novo. See McKee v. City of Rockwall, 877 F.2d 409, 410 (5th Cir. 1989). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "All reasonable doubts and inferences must be resolved in the light most favorable to the non-movant," McKee, 877 F.2d at 410 (internal citation omitted).

### B. Municipal Liability

The Supreme Court has explained that official-capacity suits should be treated as suits against the government entity. Hafer v. Melo, 502 U.S. 21, 25 (1991). In order for municipal liability to be imposed under § 1983 three elements must be proven: a policymaker, an official policy, and a violation of constitutional rights whose "moving force" is the policy or custom. Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) (citing Monell v. Dep't of Social Sciences, 436 U.S. 658 (1978). Caselaw has consistently rejected

---

[3] Specifically, she argued that the Uniform Crime Reports (UCRs) that were sent to the DPS indicate that a larger number of people were arrested, and therefore the actual percentage of family violence arrests by the WVPD was actually substantially lower.

municipal liability predicated on respondeat superior, and instead, this Court has held that "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." Id. (internal citations omitted). Because no evidence has been presented that Officer Crawford was, at any time relevant to this proceeding, a policymaker in the WVPD, we affirm the district court's dismissal of the claim against him in his official capacity.

C.     Equal Protection Claims

Before this Court, Kelley presents two arguments for why the district court's grant of summary judgment to Defendants was in error. First, she asserts that the WVPD failed to follow state law regarding domestic violence victims, and therefore it failed to enforce her protective order against Jerod. Second, she contends that her right to equal protection as a victim of domestic violence was violated as a "class of one" and that there was no rational basis for the treatment. We will examine each argument in turn.

1.

In DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 197 (1989), the Supreme Court held that "a State's failure to protect an individual against private violence does not violate the Due Process Clause." In that same opinion, however, the Court also recognized that "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." Id. at 197 n.3. While we have warned that plaintiffs cannot make an "end-run" around DeShaney by simply attempting to convert their due process claims into equal protection ones, Beltran v. City of El Paso, 367 F.3d 299, 304 (citing McKee, 877 F.2d at 413), in Shipp v. McMahon, 234 F.3d 907, 914 (5th Cir. 2000), overruled in part on other grounds by, McClendon v. City of Columbia, 305 F.3d 323, 328-29 (5th Cir. 2002)

(en banc), we "acknowledged that certain intentionally discriminatory policies, practices, and customs of law enforcement with regard to domestic assault and abuse cases may violate the Equal Protection Clause under the DeShaney footnote." Beltran, 367 F.3d at 304. In Shipp, we held that in order for a plaintiff to sustain a gender-based equal protection claim, she must show: "(1) the existence of a policy, practice, or custom of law enforcement to provide less protection to victims of domestic assault than to victims of other assault; (2) that discrimination against women was a motivating factor; and (3) that the plaintiff was injured by the policy, custom, or practice." 234 F.3d at 914.

Accordingly, Kelley was first required to show the existence of a policy, practice, or custom of law enforcement to provide less protection to victims of domestic assault than to victims of other assault. To that end, she argues that the statistics used by Commander Rodriguez, WVPD's expert, are not only inaccurate, but also that they present a distorted picture of arrests for domestic violence, enforcement of protective orders, and the treatment of domestic violence victims. She encourages this Court to rely on the data offered by her own expert, Kline, which she contends proves that the WVPD had an unwritten policy of minimizing allegations of domestic violence. While we are not convinced that Kelley has proven that women were "systemically shortchanged or deprived of effective law enforcement response by the City's policies," Beltran, 367 F.3d at 305, taking the evidence in a light most favorable to her, Kelley's evidence raises a genuine issue of material fact as to whether the WVPD failed to follow state law regarding domestic violence victims. In reaching this conclusion, we are swayed by Kline's report, which asserts that WVPD police officers consistently failed to generate offense reports, failed to report family violence to the DPS, and failed to conduct the primary duties of police officers as mandated by the Family Violence Prevention provisions of the Texas Code of Criminal Procedure.

Nevertheless, ultimately we reject Kelley's claim because she failed to prove the second element of her gender-based equal protection claim: that discrimination against women was a motivating factor. The Supreme Court has defined "discriminatory purpose" as being "more than intent as volition or intent as aware of consequences. It implies that the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979).

Kelley contends that Kline's expert report and findings provide evidence of discriminatory purpose. However, "[i]t is a truism that under current Equal Protection Clause jurisprudence, a showing of disproportionate impact alone is not enough to establish a constitutional violation . . . . The mere existence of disparate treatment—even widely disparate treatment—does not furnish adequate basis that discrimination was [impermissibly] motivated." Soto v. Flores, 103 F.3d 1056, 1067 (1st Cit. 1997) (internal quotation marks and citations omitted). Even though Kline's report highlights the various ways in which the WVPD failed to follow Texas state law regarding domestic violence victims, nothing she presents demonstrates a desire by the police department to discriminate against women. Without this showing of "invidious discrimination," Shipp, 234 F.3d at 914, Kline's findings are insufficient to satisfy the second element of Kelley's equal protection claim.

Further, although Kelley presented evidence that various police officers threatened that her children would be taken away from her by the Department of Human Services if she continued calling, such evidence is also insufficient. As the district court wrote:

> While the comments may be deemed hurtful toward the Plaintiff, the equal protection claim that is before the Court is based on the alleged discriminatory impact of a policy or custom of Defendants to provide less police protection to victims of domestic assault than

10

other assault victims. The evidence relied upon by Plaintiff is not material on the ultimate issue of whether victims of family violence received less protection than those of other crimes or that Defendants discriminated purposefully with respect to the service of protective orders in domestic violence cases.

We agree, and accordingly, hold that Kelley has failed to establish that discrimination against women was a motivating factor. In light of that, we need not analyze her claim under the third element, namely whether she was injured by the policy, custom, or practice.

2.

Next, Kelley asserts that a genuine issue of material fact exists to show that her constitutional rights to equal protection as a victim of domestic violence were violated as a "class of one" and that there was no rational basis for that treatment. We find her argument unpersuasive.

In Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), the Supreme Court recognized that equal protection claims can be brought by a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." To prevail on such a cause of action, a plaintiff does not have to allege membership in a protected class or group. Shipp, 234 F.3d at 916. However, this Court requires a plaintiff "to present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." Id. (quoting Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000)).

At most, Kelley has alleged that several WVPD officers made some inappropriate comments to her; she does not dispute that the WVPD consistently responded to the calls she made between November 2002 to July 2003, and she presented no evidence that the WVPD treated her, in any meaningful way, different than any other domestic violence victim. This case is distinguishable

from Shipp, where Cherie Shipp made a much stronger showing for her "class of one" claim. Shipp presented evidence which concretely raised the possibility that her mother-in-law's hostility towards her influenced the level of protection she received from the police department, since her mother-in-law was a deputy at the department who was "intimately involved" in the situation that led to the filing of Shipp's lawsuit. 234 F.3d at 916-17. Here, Kelley's evidence does not rise to such a level. Accordingly, she has failed to demonstrate that Defendants "deliberately sought to deprive [her] of the equal protection of the laws."

## III. CONCLUSION

While the facts of this case are undeniably tragic, Kelley has failed to make out the elements for her equal protection claims. Therefore, the judgment of the district court is AFFIRMED.