# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 8, 2019

Lyle W. Cayce
Clerk

No. 19-10217

_____

VICKIE COOK, Individually and as Natural Mother to Deanna Cook; N. W., a Minor, by and through her Grandparent and Guardian Vickie Cook; A. W., a Minor, by and through her Grandparent and Guardian Vickie Cook,

      Plaintiffs - Appellants

v.

TONYITA HOPKINS; KIMBERLEY COLE; JOHNNYE WAKEFIELD; YAMINAH SHANI MITCHELL; JULIE MENCHACA, Officer; AMY WILBURN, Officer; ANGELIA HEROD-GRAHAM; CITY OF DALLAS,

      Defendants - Appellees

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VICKIE COOK, Individually and as Natural Mother to Deanna Cook; N. W., a Minor, by and through her Grandparent and Guardian Vickie Cook; A. W., a Minor, by and through her Grandparent and Guardian Vickie Cook; KARLETHA COOK-GUNDY, Individually and as Representative of the Estate of Deanna Cook, Deceased,

      Plaintiffs - Appellants

v.

CITY OF DALLAS; ANGELIA HEROD-GRAHAM,

      Defendants – Appellees

No. 19-10217

Appeal from the United States District Court
for the Northern District of Texas
U.S.D.C. No. 3:12-CV-3788

Before STEWART, CLEMENT, and HO, Circuit Judges.

PER CURIAM:*

This appeal arises from Deanna Cook's 911 call to report domestic violence, the Dallas Police Department's response to that call, and Deanna's tragic death at the hands of her abuser.

Deanna's mother Vickie Cook, her two minor daughters, and her sister Karletha Cook-Gundy (the Independent Administrator of Deanna's estate) sued Defendants Tonyita Hopkins ("Hopkins"), Kimberley Cole ("Cole"), and Johnnye Wakefield ("Wakefield"), all of whom worked at the 911 call center on the day Deanna died; Yaminah Shani Mitchell ("Mitchell"), the police dispatcher made aware of Deanna's 911 call; Julie Menchaca and Amy Wilburn, the police officers who responded to Deanna's call that day (the "Officers"); Angelia Herod-Graham ("Herod-Graham"), who responded to Deanna's mother's 911 call two days after Deanna's death, when Plaintiffs discovered her body (collectively, the "Individual Defendants"); and the City of Dallas (the "City"), seeking damages pursuant to (i) 42 U.S.C. § 1983, alleging violations of Deanna's Fourteenth Amendment rights to due process and equal protection, and (ii) state-law tort statutes. The district court granted the Individual Defendants' and the City's motions to dismiss in part and then granted Defendants' motions for summary judgment, entering its final

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-10217

judgment on February 6, 2019. The court also denied Plaintiffs' request for additional discovery against the City. We AFFIRM the district court's judgments.

I.

On Friday, August 17, 2012, at 10:54 a.m., Deanna, a 32-year-old mother of two, called 911 to report that she was being attacked in her home by her ex-husband. Deanna had previously called the police to report her ex-husband's domestic abuse and harassment, both before they were divorced and after the divorce was finalized. Hopkins, a 911 call-center employee with the title of "Call Taker," answered Deanna's call that day. Cole, the call-center supervisor, was not at her post at the time, so Wakefield, a "Senior Call Taker," assisted Hopkins with handling and classifying Deanna's call.

On the call, Deanna was "screaming at the top of her lungs in fear, crying out for assistance," and "screaming help, please stop it" to her attacker. Deanna did not provide her address to Hopkins. Hopkins claims that because Deanna had called from a cellphone, Hopkins could not immediately retrieve Deanna's address, so she enlisted Wakefield to help find the latitude and longitude of Deanna's location. Nearly ten minutes after the call began, Hopkins notified police dispatch, classifying the call as a "Major Disturbance." Hopkins added the comment "urgent!" to her notify report. The line eventually went silent. Wakefield instructed Hopkins to hang up the phone and call Deanna back. The call went to voicemail. Hopkins did not follow up to ensure that police dispatch had actually sent officers to Deanna's residence.

Mitchell was the police dispatcher who received Deanna's location that day. She allowed police officers to volunteer for the call, despite it being marked "urgent." Menchaca and Wilburn, City of Dallas police officers, volunteered to go to Deanna's residence. On the way, the Officers stopped at 7-Eleven for bottles of water. Approximately 50 minutes after Deanna called 911, the

No. 19-10217

Officers arrived at Deanna's home. They knocked on the door and had the dispatcher call Deanna's cellphone, which went to voicemail. They avoided entering the home from the back entrance because they heard dogs barking. When the Officers didn't get a response, they left the residence and noted that the disturbance had been resolved.

Plaintiffs went to Deanna's home two days later, on Sunday, August 19, 2012, after Deanna failed to show up for church. They noticed her two chihuahuas barking and water leaking from her home. Her mother, Vickie, then called 911. Herod-Graham answered Vickie's call. She told Vickie that no police officers could help Vickie and her family enter Deanna's house unless Vickie called nearby prisons and hospitals first. Plaintiffs then kicked in the patio door of the residence and entered Deanna's bedroom, where they found Deanna deceased, her body partially in the bathtub.

Former Dallas Police Chief David Brown suspended Hopkins, issued Cole a written reprimand, and fired Herod-Graham. Under department policy, Herod-Graham should not have asked Vickie to call prisons and hospitals before sending the police to Deanna's address. Chief Brown and former Dallas Mayor Mike Rawlings also allegedly commented on Deanna's death publicly. According to Plaintiffs, Chief Brown admitted that, "[the 911 operator] obviously failed . . . and it cost the life of Ms. Cook," and Mayor Rawlings stated that, "our safety net wasn't there for her."

Plaintiffs sued Defendants in federal court, bringing § 1983 claims under the Fourteenth Amendment's Due Process and Equal Protection clauses, as well as claims under Texas' negligence, gross negligence, bystander recovery, wrongful death, and survival laws. They later filed a separate complaint in a separate suit against Herod-Graham, the City, and various telecommunications defendants (but the telecommunications defendants were dismissed). The district court agreed to consolidate the two cases in 2015.

No. 19-10217

The Individual Defendants all filed Rule 12(b)(6) motions to dismiss for failure to state a plausible claim. With the exception of Cole, against whom all of Plaintiffs' claims were dismissed,[1] the district court dismissed all of Plaintiffs' claims against the Individual Defendants except for their equal protection claims for discrimination based on race, gender, socioeconomic background, and status as a domestic-violence victim.[2] The Individual Defendants, excluding (i) Cole and (ii) Herod-Graham, who moved for summary judgment separately, then moved for summary judgment based on qualified immunity, which the district court granted, finding that Plaintiffs had failed to raise any genuine disputes of material fact as to whether they had discriminated against Deanna in violation of the Equal Protection Clause. The district court later granted Herod-Graham's motion for summary judgment based on, *inter alia*, qualified immunity, holding that Vickie's equal protection rights had not been violated.

The City moved to dismiss Plaintiffs' claims in a Rule 12(c) motion, which the district court granted in part. The City also filed two Rule 12(b)(6) motions to dismiss (which included leftover claims from the consolidated cases). Finally, the City moved for summary judgment in two separate instances. The district court granted the City's motions for summary judgment on the

---

[1] Defendants correctly note that Plaintiffs do not adequately brief Cole's alleged liability under the Fourteenth Amendment. Their briefing makes one off-hand reference to Cole's role in "providing discriminatory practices to Hopkins through training."

[2] The district court correctly noted that government employees cannot request the dismissal of claims filed under the state statute from which Plaintiffs' state-law tort claims arose. *See* Tex. Civ. Prac. & Rem. Code § 101.106(e); *Hernandez v. City of Lubbock*, 253 S.W.3d 750, 755 (Tex. App. 2007) ("We see nothing . . . construing section 101.106(e) to provide for dismissal of an employee on the motion of any but the governmental unit defendant."). However, once the "governmental unit" at issue has filed a motion to dismiss those tort claims filed under § 101.106(e) against itself and its employees, "the employees shall immediately be dismissed." *See* Tex. Civ. Prac. & Rem. Code § 101.106(e). Because the district court granted the City's motion to dismiss with respect to those state-law tort claims, the court uniformly denied as moot Plaintiffs' state-law tort claims against the Individual Defendants.

municipal-liability claims based on the proposition in *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), that a municipality cannot be held liable if plaintiffs cannot show that a constitutional deprivation has occurred. Because the district court had already held that none of the Individual Defendants had violated Deanna's or Vickie's rights to equal protection, the court held that Plaintiffs' claims against the City could not survive. The court also granted the City's motion for summary judgment on the state-law tort claims. Finally, on separate occasions, the district court denied Plaintiffs additional discovery.

As will be discussed below, Plaintiffs attempt to appeal all of the district court's decisions. We note that Plaintiffs fail to address or present arguments as to some of these decisions, and consequently, we consider those arguments forfeited. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) ("It has long been the rule in this circuit that any issues not briefed on appeal are waived."); *Yohney v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993) (one "abandon[s] [one's] arguments by failing to argue them in the body of [one's] brief"); Fed. R. App. P. 28(a)(8)(A) (the argument in appellant's brief "must contain . . . appellant's contentions and the reasons for them").

II.

We review the district court's dismissals of complaints under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim de novo. *Mowbray v. Cameron County*, 274 F.3d 269, 276 (5th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In evaluating motions to dismiss, we must view the well-pleaded facts in the light most

favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *Iqbal*, 556 U.S. at 678. And "[a]lthough for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

We review the district court's grants of summary judgment de novo, applying the same standards as the district court. *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019). The court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is proper "only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact." *Anderson*, 477 U.S. at 247–48. Further, we must consider all evidence, "but may not make 'credibility assessments,' which are the exclusive province of the trier of fact." *La Day v. Catalyst Tech., Inc.,* 302 F.3d 474, 477 (5th Cir. 2002) (quoting *Dibidale, Inc. v. Am. Bank & Trust Co.*, 916 F.2d 300, 307–08 (5th Cir.1990)). Although the moving party generally bears the burden of demonstrating to the court that a genuine issue for trial does not exist, a "qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). The burden shifts to the non-movant to show that qualified immunity does not apply. *Id.*

No. 19-10217

We review the district court's denial of discovery for abuse of discretion. *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 936 F.3d 251, 256 (5th Cir. 2019). "A trial court enjoys wide discretion in determining the scope and effect of discovery, and it is therefore unusual to find an abuse of discretion in discovery matters." *EEOC v. BDO USA, L.L.P.,* 876 F.3d 690, 698 (5th Cir. 2017) (cleaned up). When the trial court bases its decision "on an erroneous view of the law," it has abused its discretion. *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011). However, "[e]ven if a district court abuses its discretion, the reviewing court will not overturn its ruling unless it substantially affects the rights of the appellant." *JP Morgan*, 936 F.3d at 256.

## III.

### *A. Motions to Dismiss Plaintiffs' Due Process Claims*[3]

Plaintiffs contend that the district court erred in dismissing their due process claims brought against Individual Defendants in their personal capacities[4] and the City pursuant to 42 U.S.C. § 1983. The Due Process clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. But the Supreme Court has held that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where

---

[3] We note that Plaintiffs' due process claim pursuant to § 1983 in its First Amended Complaint (including the telecommunications defendants) against Herod-Graham was dismissed for failure to allege facts that state a plausible claim. We agree with the district court.

[4] We also note that Plaintiffs' complaint does not clearly state whether suit was brought against the Individual Defendants in their official capacities. The district court determined that the Individual Defendants were sued in their personal capacities, because a suit against an officer of the state in his or her official capacity is no different than "pleading an action against an entity of which an officer is an agent," and Plaintiffs' complaint already named the City. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 n.55 (1978). We agree with the district court's reasoning.

such aid may be necessary to secure life, liberty, or property interests." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). And the "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *McClendon v. City of Columbia,* 305 F.3d 314, 324 (5th Cir. 2002) (quoting *DeShaney,* 489 U.S. at 197)). However, in "certain limited circumstances," the state can form a "special relationship" with an individual that "imposes upon the state a constitutional duty to protect that individual from dangers, including . . . private violence." *Id.* at 324. Those "certain limited circumstances" are instances where the state affirmatively exercises its powers "to restrain the individual's freedom to act on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty.'" *Id.* (quoting *DeShaney,* 489 U.S. at 200).

Plaintiffs argue that because the City "promised Deanna" that they would increase police patrols in her neighborhood and arrest her abuser when she called, the state created a "special relationship" between Deanna and itself. However, it would be contrary to our precedent and Supreme Court precedent to recognize a "special relationship" here. The complaint does not allege that any of the Defendants affirmatively acted to restrain Deanna's personal liberty in a similar way to incarceration or institutionalization. In *Beltran v. City of El Paso*, this court held that a plaintiff grandmother whose granddaughter was killed by her father, a domestic abuser, did not show that the state had created a "special relationship" where the 911 operator who took the granddaughter's call on the date she was murdered informed the granddaughter that the police "would be sent out" but "[n]o police units immediately responded." 367 F.3d 299, 302 (5th Cir. 2004). There, the grandmother alleged that her granddaughter had relied on "falsely promised police services . . . to her detriment." *Id.* at 307. Further, the 911 operator in *Beltran* told the

granddaughter to lock herself in her bathroom to avoid her father, which the grandmother alleged was a restraint on personal liberty. *Id.* The facts here involve less restraint on liberty than those in *Beltran*, where the court found no "special relationship" existed. *Id.* at 307–08. First, the alleged "promise" of additional police services and arrest of Deanna's ex-husband is removed in time from Deanna's death. Second, the 911 call-center employees did not tell Deanna to remain in her home on the day of her death, much less tell her to barricade herself in the bathroom to avoid her attacker. There is simply no allegation in the complaint that the Defendants here restrained Deanna's liberty sufficiently to show that a "special relationship" existed.

It's true that Deanna might have a viable claim for violation of her due process rights if this circuit recognized the "state-created danger theory," which can make the state liable under § 1983 if "it created or exacerbated the danger" of private violence against an individual. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 466 (5th Cir. 2010). Plaintiffs rely heavily on an out-of-circuit opinion, *Okin v. Village of Cornwall-on-Hudson Police Department*, in which the Second Circuit held that the state-created danger theory gave rise to a substantive due process violation where "police conduct . . . encourage[d] a private citizen to engage in domestic violence, by fostering the belief that his intentionally violent behavior [would] not be confronted by arrest, punishment, or police interference." 577 F.3d 415, 437 (2d Cir. 2009). But, as the district court explained, this circuit does not recognize the state-created danger theory, and we decline to do so today, despite Plaintiffs' urging that "[t]his is that case." *See Beltran*, 367 F.3d at 307 (citing *McClendon*, 305 F.3d at 327–33) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1983 liability even where the question of the theory's viability has been squarely presented."); *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 688 (5th Cir. 2017) ("[P]anels [in this circuit] have repeatedly noted the

unavailability of the [state-created danger] theory.") (cleaned up). In sum, the district court did not err in dismissing Plaintiffs' due process claims against Defendants.

### B. Motions for Summary Judgment

### i. Equal Protection Claims: Individual Defendants' Qualified Immunity

Plaintiffs argue that the district court erred in granting summary judgment in favor of the Individual Defendants on Plaintiffs' § 1983 equal-protection claims based on discrimination against Deanna for her race, gender, socioeconomic background, and status as a domestic-violence victim. Plaintiffs contend that, in determining whether the Individual Defendants were entitled to qualified immunity on these claims, the district court erred by allegedly "weighing the witness' credibility" and ignoring "material fact disputes indicating Plaintiffs were treated differently from other similarly situated individuals."

"To establish an entitlement to qualified immunity, a government official must first show that the conduct occurred while he was acting in his official capacity and within the scope of his discretionary authority." *Beltran*, 396 F.3d at 303. A two-pronged inquiry then applies in a qualified-immunity analysis: "First, the court must determine whether the plaintiff has alleged a violation of a clearly established federal constitutional or statutory right. Second, the court must determine whether the official's conduct was objectively reasonable in light of the clearly established legal rules at the time of the alleged violation." *Id.*

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Generally, to state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege "that [(1) she] received treatment different from that received by similarly situated

individuals and that [(2)] the unequal treatment stemmed from a discriminatory intent." *Fennell v. Marion Ind. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (race-based equal protection claim); *see Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 238 (5th Cir. 2012) (equal protection claim alleging discrimination against a protected class). Panels in this circuit have recognized that the "Equal Protection Clause should not be used to make an end-run around the *DeShaney* principle that there is no constitutional right to state protection for acts carried out by a private actor." *Beltran*, 396 F.3d at 304; *see Kelley v. City of Wake Village,* 264 F. App'x 437, 442 (5th Cir. 2008) (per curiam). But a governmental entity providing protective services "may not, of course, selectively deny its [] services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney*, 489 U.S. at 197 n.3.

In *Shipp v. McMahon*, this court adopted "a coherent approach for courts to review Equal Protection claims pertaining to law enforcement's practices, policies, and customs toward domestic assault cases." 234 F.3d 907, 914 (5th Cir. 2000), overruled in part on other grounds by *McClendon*, 305 F.3d at 328−29. To sustain a gender-based equal protection challenge under our precedent, a plaintiff must show "(1) the existence of a policy, practice, or custom of [government officials] to provide less protection to victims of domestic assault than to victims of other assaults; (2) that discrimination against women was a motivating factor; and (3) that the plaintiff was injured by the policy, custom or practice." *Id.*; *see Beltran*, 367 F.3d at 304−05. "[O]fficials will be liable only for those policies, practices, customs, and conduct that are the product of invidious discrimination." *Shipp*, 234 F.3d at 914.

So, in considering qualified immunity here, our analysis turns on the first prong of a qualified immunity inquiry: Have Plaintiffs raised a fact dispute as to whether the Individual Defendants intentionally discriminated against Deanna and Vickie and treated them differently? And, with respect to

the claims based on gender and status as a domestic-violence victim, were Plaintiffs injured by an existing policy, practice, or custom to provide lesser protections to victims of domestic assault, which was motivated by discrimination against women? (Defendants admit that it "was clearly established at the time of Deanna's and Vickie's [911] calls that the Fourteenth Amendment's Equal Protection Clause prohibited intentional discrimination in the provision of police protective services.")

We first note that Plaintiffs conflate our *Shipp* equal protection analysis with respect to their gender- and status as a domestic-violence victim-based claims with the equal protection analysis that this court conducts with respect to race- and socioeconomic-based equal protection claims. For example, Plaintiffs allege that the City has an "Ignore and Delay strategy as it relates to victims like Deanna," presumably meaning "female domestic violence victims, minorities[,] and residents of neighborhoods such as Deanna's."[5] Accordingly, here, we will separate our *Shipp* and race- and socioeconomic-based equal protection analyses.

We agree with the district court in its order granting Herod-Graham's motion for summary judgment that Plaintiffs, for the purposes of our *Shipp* analysis, have "produce[d] evidence sufficient to [raise a material-fact dispute]

---

[5] Plaintiffs claim this strategy is demonstrated in the City's "(i) allowing officers to 'volunteer' to investigate domestic violence disturbances or purposefully delay responding to domestic violence victims; (ii) providing a lesser degree of protection to female domestic violence victims than to victims of other assaults through not providing information required by Art. 5.04(a) of the Texas Code of Criminal Procedure; (iii) providing less protection to female victims in minority-race neighborhoods than to victims in other neighborhoods; (iv) giving lower priority to domestic violence calls than to non-domestic violence calls; (v) arriving at Deanna's residence at a time (more than 50 minutes after her [911] call) considerably in excess of the time officers respond to similarly situated persons in affluent neighborhoods without a predominantly minority population; (vi) giving less police assistance to women victims; (vii) prohibiting officers from driving fast with lights and sirens and making emergency residential entries for domestic violence claims; and (viii) allowing officers to stop for personal purchases en route to 'urgent-flagged' domestic violence calls."

that the City, at the time of the incident at hand, had a custom of providing less protection in 911 call taking on the bases of . . . [gender] and status as a domestic violence victim." Considering the record in the light most favorable to Plaintiffs, we recognize that the City made changes to its policies regarding response procedures for domestic violence complaints in the years following Deanna's death; the fact that public officials acknowledged that the City's policies were not working to protect victims of domestic violence; the evidence of misplaced paperwork and domestic violence cases that went unattended to by law enforcement; and the disciplinary actions against the call-center employees. However, on the second prong of our *Shipp* analysis, we find that Plaintiffs have failed to raise a genuine dispute of material fact as to whether discrimination against women was a motivating factor. A "discriminatory purpose" is "more than intent as volition or intent as aware of consequences. It implies that the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Kelley*, 264 F. App'x at 443 (quoting *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)). Further, "it is a truism that under current *Equal Protection Clause* jurisprudence, a showing of disproportionate impact alone is not enough to establish a constitutional violation . . . . The mere existence of disparate treatment—even widely disparate treatment—does not furnish adequate basis that discrimination was impermissibly motivated." *Id.* (quoting *Soto v. Flores*, 103 F.3d 1056, 1067 (1st Cir. 1997)). Here, although there may have been customs or policies in place that disproportionately affected female victims of domestic violence in a negative way, Plaintiffs have not shown that these customs or policies were motivated by a desire to discriminate against women. If anything, the actions and statements of the City's officials regarding domestic violence following Deanna's death demonstrate the opposite of intentional discrimination. Thus, we find that

Plaintiffs do not raise material-fact disputes as to whether Deanna's and Vickie's equal protection rights were violated based on their gender or Deanna's status as a domestic-violence victim.

Plaintiffs stress in their reply brief that the district court did not address whether there was a genuine dispute of material fact as to whether Deanna and Vickie were treated differently than similarly-situated individuals. However, this analysis applies only to Plaintiffs' race- and socioeconomic-based equal protection claims. (As discussed above, the *Shipp* analysis applies to their gender- and status as a domestic-violence victim-based claims.) Most importantly, Plaintiffs fail to recognize that, to survive summary judgment on their equal protection allegations based on their race or socioeconomic class would require raising a material-fact dispute as to whether Deanna and Vickie were "*intentionally* treated differently from others similarly situated." *Gibson*, 700 F.3d at 238 (emphasis added). So, now, with respect to Plaintiffs' race- and socioeconomic-based § 1983 claims, we consider (i) the foregoing "similarly situated" equal protection inquiry, and (ii) "if a state actor *intentionally* discriminated against [Plaintiffs] because of [their] membership in a protected class." *Id.* (emphasis added).

Plaintiffs' race-based claim seems to be premised on the conduct of April Sims, a 911 call-center employee who posted racist comments to her social media account regarding the 911 calls she received. As egregious as Sims's comments were, we do not see how Sims's conduct has any link to Plaintiffs' proposition that Deanna and Vickie were *intentionally* discriminated against and *intentionally* treated differently because of their race. Instead, the evidence in the record shows that Sims was an outlier, who was deservedly fired from her position. Relatedly, Plaintiffs' socioeconomic-based claim seems to be based on their argument that private citizens who pay for security alarm systems receive higher priority than citizens in poorer neighborhoods (i.e.,

faster police responses and the like). But there is no fact dispute here, because there is no "fact" to dispute: Plaintiffs rely on Cole's statement that she didn't "have [] information" as to whether that was true.

Plaintiffs make the same type of argument with respect to their claims that the Officers responded to calls from similarly-situated Caucasian women or calls from affluent neighborhoods more quickly. For example, Plaintiffs characterize an "I do not remember" or "I'm not sure" answer as an admission from the Officers. And on both claims, Plaintiffs consistently argue that a fact dispute regarding Individual Defendants' intentional discrimination against Deanna and Vickie exists because of the "evidence" that Individual Defendants "could recognize traits of" Deanna and Vickie from the call, and that the district court made improper credibility assessments in considering the record with respect to this assertion. We recognize that the district court considered Individual Defendants' testimony that they did not know of Deanna's (or, where applicable, Vickie's) race or recognize the area in which she resided. But summary judgment requires that a party "asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). And here, Plaintiffs fail to identify evidence in the record disputing the fact that Individual Defendants were not aware of Deanna's or Vickie's race or socioeconomic background.

Thus, Plaintiffs have not satisfied prong one of our qualified-immunity analysis regarding summary judgment, which would require them to show a genuine dispute of material fact as to whether Individual Defendants violated Deanna's or Vickie's equal protection rights. The district court did not err. We

also find that the district court did not make improper credibility assessments in considering the evidence in the record.

### ii. Equal Protection Claim: The City

Plaintiffs contend that the district court erred in granting summary judgment in favor of the City with respect to their municipal-liability claims. The district court granted the City's motions for summary judgment based on the proposition in *City of Los Angeles v. Heller* that a municipality cannot be held liable if Plaintiffs cannot show that a constitutional deprivation has occurred. *Heller,* 475 U.S. at 799. Specifically, the City argues that *Heller* holds that, "if [a City employee] inflicted no constitutional injury on [the Plaintiffs], it is inconceivable that [the City] could be liable." *Id*. The district court agreed with the City, noting that in a footnote in a published Fifth Circuit case, the panel wrote that "*Heller*, however, held only that if no claim is stated against officials—if plaintiff does not show any violation of his constitutional rights— then there exists no liability to pass through to the [municipality]." *Brown v. Lyford*, 243 F.3d 185, 191 n.18 (5th Cir. 2001). Plaintiffs conversely argue that this circuit has not yet confronted the question of "whether municipal liability is available if no individual liability exists." *See Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011). We agree with the district court that Plaintiffs are mistaken as to the City's argument: "The City does not argue that the law requires that once all personal capacity claims are dismissed, the municipal-liability claims must also be dismissed." Instead, the City argues that because we have "unambiguously determined" that the Individual Defendants did not violate Deanna's or Vickie's equal protection rights, we must affirm the City's motion for summary judgment under *Heller* as no constitutional deprivation occurred. In sum, we agree with the district court and the City that the *Brown v. Lyford* footnote is sufficient to support our holding here that, under *Heller*, because we have found no constitutional

violations on the part of the Individual Defendants, the City cannot be subjected to municipal liability. *See Brown*, 243 F.3d at 191 n.18; *see also Cardenas v. San Antonio Police Dep't*, 417 F. App'x 401, 402 (5th Cir. 2011) (per curiam) (holding that, because "individual defendants did not inflict any constitutional harm on [plaintiff], the district court properly granted summary judgment for the City"); *Blair v. City of Dallas*, 666 F. App'x 337, 341 (5th Cir. 2016) (per curiam) (noting that *Heller* holds that "there cannot be municipal liability under § 1983 absent an underlying constitutional violation").

### C. *"Class of One" Equal Protection Claims*

Plaintiffs also contest the district court's dismissal of their "alternative" equal protection claim: That the Individual Defendants and the City discriminated against Deanna in violation of her constitutional rights to equal protection because of their "disdain for her as a recurrent domestic violence caller." Plaintiffs here could bring a "class of one" equal protection claim if they "allege[d] that [Deanna] [had] been intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The district court held below that Plaintiffs failed to state a claim that Defendants violated Deanna's equal protection rights as a "class of one" because their complaint merely alleged Deanna was a member of one of the classes identified (i.e., a class based on her race, gender, socioeconomic status, and status as a domestic-violence victim), rather than alleging she was a member of a "class of one." We agree with the district court that Plaintiffs did not sufficiently plead the "class of one" theory in their complaint. *See* Fed. R. Civ. P. 8(d) ("Each allegation must be simple, concise, and direct.").

The district court noted that it did not grant Plaintiffs leave to amend on the "class of one" issue because they did not "demonstrate how a *fourth* round of pleadings [would] correct the aforementioned deficiencies because facts do

not show that defendants acted in derogation of [Deanna's] rights as an entity unto herself." Assuming *arguendo* that Plaintiffs did plead their "class of one" theory appropriately, this court has held that a plaintiff alleging he or she is a "class of one" must "present evidence that the defendant deliberately sought to deprive him [or her] of the equal protection of the laws for reasons of *a personal nature unrelated to the duties of the defendant's position.*" *Kelley*, 264 F. App'x at 444 (emphasis added). In *Kelley*, the panel noted that the plaintiff victim of domestic violence was not denied her equal protection rights as a "class of one" because she could not provide evidence that the police department and 911-response department *deliberately* sought to deprive her of equal protection under the law. *Id.* Like the plaintiff in *Kelley*, Plaintiffs here do not dispute that the Individual Defendants and the City consistently responded to Deanna's past 911 calls. *Id.* Further, the plaintiff in *Kelley* was allegedly subjected to police officers' "inappropriate comments," which the panel in that case found was not enough to survive the defendant police officers' motion for summary judgment. *Id.* Here, the only defendant who had contact with Deanna is Hopkins. And the only fact that could possibly support an argument that Hopkins "singled out" Deanna is the lag in time between when Hopkins answered Deanna's call and when she notified police dispatch of Deanna's emergency. But in light of *Kelley*, this is clearly not enough to allege a "class of one" equal protection claim. And most importantly, there is no indication that Hopkins' actions were *deliberate* against *Deanna herself.*

### D. State-Law Tort Claims

As noted above, the district court denied as moot Plaintiffs' state-law tort claims against the Individual Defendants, and the state-law tort claims against the Individual Defendants and the City from the original complaint were dismissed by the district court pursuant to Fed. R. Civ. P. 12(c). *See supra* note 2. However, Plaintiffs' tort claims against the City regarding Vickie's 911

call on August 19, 2012, were not addressed until the City moved for summary judgment on this issue. Plaintiffs dispute the district court's grant of summary judgment in favor of the City on the state-law tort claims only with respect to Vickie's 911 call in their briefing, so we consider their other arguments below as to the tort claims forfeited.

Plaintiffs argue that the district court erred in granting summary judgment in favor of the City on the state-law tort claims arising from Herod-Graham's conduct on August 19, 2012, i.e., two days after Deanna's death and the day her family discovered her body. The district court held that the City was entitled to governmental immunity[6] as to Plaintiffs' tort claims of negligent infliction of emotional distress, intentional infliction of emotional distress, and common-law bystander claims. *See Gipson v. City of Dallas*, 247 S.W.3d 465, 469 (Tex. App. 2008) ("Municipal corporations have traditionally been afforded some degree of governmental immunity for governmental functions, unless that immunity is waived. The operation of an emergency ambulance service is a governmental function."). Plaintiffs contend that the "non-delivery of medical services to [Plaintiffs] on August 19, 2012 was proprietary in nature or a mixture of functions." *See Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) ("A municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions."). Plaintiffs state

---

[6] The district court held that the City was entitled to "sovereign immunity" under Texas law. We recognize that the district court was referring to "governmental immunity" under Texas law here. *See Wichita Falls State Hospital v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003) ("Courts often use the terms sovereign immunity and governmental immunity interchangeably. However, they involve two distinct concepts. Sovereign immunity refers to the State's immunity from suit and liability. In addition to protecting the State from liability, it also protects the various divisions of state government, including agencies, boards, hospitals, and universities. Governmental immunity, on the other hand, protects political subdivisions of the State, including counties, cities, and school districts.").

that "911 is not a part of the police," but rather, "is a separate civilian department." But they identify no evidence to support that contention. Plaintiffs further state that "EMT assistance is a proprietary function."

We agree with the district court that this argument is misguided. Texas law explicitly states that police and ambulance (i.e., EMT) services are *governmental* functions. Tex. Civ. Prac. & Rem. Code § 101.0215(a)(1), (18). The district court was correct to grant the City's motion for summary judgment with respect to the relevant state-law tort claims.

*E. Discovery*[7]

Plaintiffs argue that the district court abused its discretion in denying their "Emergency Motion to Continue the City's Motion for Summary Judgment" in response to the City's second motion for summary judgment. In the motion, Plaintiffs requested additional discovery (namely, depositions of City officials) and a continuance to help "prove the City's customs and practices of discrimination against domestic violence victims such as Deanna, the City's failure to train, supervise and discipline and demonstrate how these practices were the moving forces behind the treatment Plaintiffs received from the Individual Defendants." The district court denied Plaintiffs' request on the basis that the City's motion for summary judgment was premised upon a pure issue of law—i.e., "whether the City can be held liable under 42 U.S.C. § 1983 after a court has determined that all the defendant city employees did not commit constitutional violations"—and thus, additional discovery would be futile. The district court did not abuse its discretion in denying Plaintiffs' motion here. The court correctly noted that additional discovery could be

---

[7] We consider Plaintiffs' assertion that the district court abused its discretion in denying Plaintiffs' "Emergency Motion for Discovery Preservation and for Leave of Court to Conduct Discovery" (filed on October 19, 2012) forfeited because the Plaintiffs fail to adequately brief the issue.

No. 19-10217

warranted if Plaintiffs' legal arguments turned out to be correct. But because the City's motion for summary judgment did not raise any issues of fact and turned on a pure issue of law, additional discovery was not necessary at that time. *See Hunt v. Johnson,* 90 F. App'x 702, 704 (5th Cir. 2004) (citing *Williams v. Phillips Petroleum Co.,* 23 F.3d 930, 937 (5th Cir. 1994)).

## IV.

For the foregoing reasons, we AFFIRM the district court's judgments with respect to the decisions on appeal in full.